[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a marital dissolution action filed on December 12, 1995 in which the parties have disagreements concerning child support, alimony, property distribution, and the payment of fees. Based on the evidence adduced at the hearing, the court makes the following findings and orders.
Lori Ferguson, nee Schaefer, and Lee Ferguson were married on November 25, 1978 in Plainville, Connecticut. They have both resided continuously in Connecticut for several years. During the marriage, the Fergusons have had four children: Ryan, born April 2, 1980, Geoffrey, born February 15, 1982, Thomas, born April 22, 1983, and Andrew, who was born on September 10, 1985.
The parties separated in the latter part of 1995. Mrs. Ferguson remains in the former marital residence located at 135 Hollyberry Lane in Plainville, Connecticut with the parties' three minor children. She is forty-two years old and a high school graduate. Though she was accepted as a student at the University of Vermont, Mrs. Ferguson chose, instead, to work following high school. For a brief period, she worked for Aetna, and then for Ferguson Electric Company (Ferguson Electric). Though she remains nominally on the Ferguson Electric payroll, Mrs. Ferguson has spent most of the marital years as a homemaker and the children's primary care giver. While Mrs. Ferguson is clearly an intelligent individual, her singular commitment to her family and the maintenance of the parties' home consumed CT Page 12127 her time during the marriage and has left her with no demonstrated earning capacity at this juncture.
Mr. Ferguson, who is forty-one years old, and the parties' adult son, Ryan, reside at 189 Redstone Hill Road in Bristol, Connecticut, in a home owned by the defendant's parents. Ryan, who finished high school being home-tutored after his expulsion from school, attends Milton Academy as a post graduate and hopes to gain admission to college. The defendant's parents reside primarily in South Carolina, returning to their Connecticut residence at holiday periods during the year.
In 1974, following his high school graduation, Mr. Ferguson went to work for Ferguson Electric, first as an apprentice, and then as a licensed electrician. In 1983, he moved into a managerial position with the business, and he is now its president and chief executive officer. When Mr. Ferguson started with Ferguson Electric, the company employed approximately twenty-one people. Now, there are approximately one hundred and eighty individuals on the payroll. In the most recently completed fiscal year, the company's gross revenues were approximately twenty-five million ($25,000,000) dollars.
Ferguson Electric was started by the defendant's grandfather in 1925 as an electrical contracting company. The defendant's father, Thomas Ferguson, was active in the business until last year when he retired. While the defendant owns fifty-two (52%) percent of the company's stock and thirty-eight (38%) percent of its voting stock, his father and mother, between them, own sixty-two (62%) percent of the voting stock. The parties have stipulated, and the court finds, that the defendant's interest in Ferguson Electric has a value of six hundred and twenty-five thousand ($625,000) dollars. The defendant acquired his stock through gifts and purchases made available to him by his parents as a result of his employment and leadership at Ferguson Electric throughout the course of the marriage.
Less readily discernable is the amount of disposable income available to the defendant through Ferguson Electric. While Mr. Ferguson claims weekly gross income of fifteen hundred ($1,500) dollars on his financial affidavit, trial evidence supports a finding that the defendant receives substantially more compensation than he reports. During the pendency of this action, the company has paid the plaintiff a salary of approximately thirteen thousand, five hundred ($13,500) dollars a year and CT Page 12128 provided her a maintenance and gas-free car without cost to her. For these benefits, Mrs. Ferguson has provided no services to Ferguson Electric. These payments, however, have had the effect of relieving Mr. Ferguson of a portion of his personal obligation to his wife.[1] Through his employment, Mr. Ferguson is also provided the use of an automobile maintained and fueled by the company with no limitations for his personal use. Also, Mr. Ferguson has the use of a corporate American Express credit card with no consistently-applied requirement that he reimburse the company for personal expenses charged to it, and the company pays his dues to belong to the Farmington Country Club.[2] While the precise value to Mr. Ferguson of the company's payment of a salary to Mrs. Ferguson, and the aggregate value of the "perks" provided to both of them may be difficult to determine with precision, the court is satisfied from the evidence that their combined value amounts to no less than twenty thousand ($20,000) dollars a year.
The "perks" received by Mr. Ferguson and the benefit he has received from the company's payments directly to Mrs. Ferguson represent a small portion of the additional compensation Mr. Ferguson receives from the company. In the past eighteen months, he has received distributions amounting to approximately two hundred thousand ($200,000) dollars in addition to his stated salary. Though he characterized these distributions as loans, the court heard no credible evidence that the defendant has repaid any funds to the company. The disbursement of these funds to the defendant is some evidence of the company's ample liquidity.
For the fiscal year ending November 30, 1997, the company's financial statement reflected net income to the company of approximately two hundred and thirty-five thousand ($235,000) dollars. Though the court understands that the attribution of Chapter S income to shareholders does not necessarily equate to their actual receipt of this income, the company's gross revenues, profitability, and cash position all support the view that the company is, in fact, in the position to provide cash distributions of the magnitude of two hundred thousand ($200,000) dollars to the defendant within the past eighteen months without a business-related need for timely, or any, repayment. Additionally, the ability of the company to "lend" substantial sums to the defendant over the past several months, is some evidence of its ability to actually pay stated profits to its shareholders.[3]
Historically, because the company is a Chapter S corporation, a portion of its profits has been reported as income to the CT Page 12129 defendant on the parties' personal income tax returns. In 1992, Mr. and Mrs. Ferguson reported the receipt of two hundred and ninety thousand ($290,000) dollars as wages or salary from Ferguson Electric. In 1993, they reported one hundred twenty-one ($121,000) thousand; in 1994, one hundred thirteen ($113,000) thousand; in 1995, one hundred thirty-four thousand, six hundred and thirty-nine ($134,639) dollars, and in 1996, ninety-three ($93,000) thousand. Though the defendant has not yet filed his personal tax returns for calendar year 1997, the corporate financial statement for the year ending November, 1997, indicates net corporate income of approximately two hundred and thirty-five thousand ($235,000) dollars. It is reasonable for the court to conclude that approximately fifty-two (52%) percent of the company's net profit will be allocable to the defendant on his 1997 tax return.[4]
From the evidence adduced from tax returns, financial statements and affidavits, credit card usage, personal use of motor vehicles, and payment of salary to Mrs. Ferguson the court finds that the defendant has available to him, in salary, "perks", and a share of corporate profits, the aggregate annual sum of approximately one hundred seventy-three ($173,000) thousand dollars, or approximately three thousand, three hundred and twenty-six ($3,326) dollars a week.[5]
When the parties were married, Ferguson Electric operated out of a garage located by the defendant's grandfather's home. During the course of the marriage, the company relocated to its present location on Northwest Drive in Plainville. The property on which the business is located is owned jointly by the defendant and his father, Thomas Ferguson. Historically, the company paid annual rent of one hundred thirty-nine thousand, two hundred ($139,200) dollars to the Fergusons, and the company was responsible for utilities, taxes, and insurance on the property. In March, 1997, however, the company agreed to increased rental payments of one hundred and sixty-five thousand ($165,000) dollars, or thirteen thousand, seven hundred and fifty ($13,750) dollars a month, plus utilities, taxes and insurance. At trial, Thomas Ferguson acknowledged that he receives a cash distribution of four thousand ($4,000) dollars a month as rental payment.[6] On their joint tax returns through 1995, the year in which this action was started, Mr. Ferguson reported a portion of the rental income as income on the parties joint Federal tax returns. Though this property remains in joint names, Mr. Ferguson now claims that he receives none of the rental income. In support of his claim, Mr. Ferguson provided the court a copy of an undated CT Page 12130 partnership agreement, stated to be "made as of October 30, 1987", through which he and his father agree that all cash distributions from the partnership would be made to Thomas Ferguson. cf. Defendant's Exhibit I, undated Articles of Co-Partnership. Thus, he asserts, the court should not attribute any of the rental income to him. The court is unpersuaded. The claim that this partnership agreement was effective as of 1987 is belied by the credible facts adduced at the hearing. Though the defendant and his father claim that their partnership was longstanding, never prior to the inception of this action did they file a partnership return. And the first return they filed is telling. On the front page of the partnership return it is noted that the business started on "01/01/1996". Plaintiff's Exhibit 24, 1996 Federal Partnership Return. Additionally, a review of the undated partnership agreement fails to reflect any consideration for the defendant's concession that his father should receive all the cash distributions from this enterprise. The court views this agreement as a shallow effort on the part of the defendant, abetted by his father, to deflect the attribution of income from himself to his father. Thus, while the court credits the evidence that Thomas Ferguson alone receives cash distributions from this activity, the defendant's agreement to forego the receipt of payments is no more than a gift on his part to his father.
On his financial affidavit, the defendant has portrayed his interest in the business property as a negative asset. He states the value of the building owned by Ferguson Realty to be eight hundred thousand ($800,000) dollars with a mortgage of nine hundred and two thousand ($902,000) dollars. However, in the Ferguson Realty Partnership Tax Return for 1996, the partners posit the value of the partnership building, land, and cash to be one million, three hundred and forty-seven thousand, five hundred and seventy-two ($1,347,572) dollars, gross of depreciation, and its liabilities to total one million, fifty-two thousand ($1,052,000) dollars. Notwithstanding the generous cash flow arrangement with his father, the defendant's interest in the land and building which house Ferguson Electric has economic value.
Ferguson Electric is not the only source of the defendant's funds.
In 1986, the defendant purchased land in Farmington with the intention of developing a twenty lot residential subdivision. Funds for the purchase of this subdivision came from the parties' savings and from bank financing. While he has subdivided and CT Page 12131 partially completed this project, selling several lots and homes, he retains ownership of sixteen lots with a fair market value of approximately nine hundred and twenty-five thousand ($925,000) dollars.[7] The defendant has an outstanding mortgage obligation of approximately three hundred and eighty-eight thousand ($388,000) dollars in conjunction with this project. During the course of this marital dissolution action, the defendant and his mother, Jacqueline Ferguson, formed a limited liability company into which the defendant wished to transfer the remaining lots in this subdivision. Though the pendency of this action prevented such a conveyance, the defendant and Jacqueline formed an entity known as LTF Developers, LLC as the business entity for the development and marketing of the remaining sixteen lots and the receipt of funds from their sale.[8] In the past several months, the defendant has sold three lots for which he has received gross distributions in excess of six hundred and forty thousand ($640,000) dollars. Even though he and his mother claim that they have entered into a business arrangement to market the remaining lots in this subdivision, Jacqueline Ferguson testified that the defendant has provided her no accounting regarding the sum of one hundred fifty-eight thousand ($158,000) he received on the sale of lot #3, no accounting for the sum of one hundred eighty-six thousand ($186,000) dollars he received upon the closing of lot #22, or the sum of one hundred fifty-six thousand ($156,000) dollars he received upon the closing of 11 Pequabuck Lane. The defendant acknowledged, on examination, that the LTF Developers, LLC bank account has a present balance of approximately eighty-seven thousand ($87,000) dollars. Notwithstanding the creation of LTF Developers, LLC, these funds, in fact, belong to the defendant.
The defendant and his parents claim that the defendant owes his parents six hundred and seventy-seven thousand ($677,000) dollars for monies loaned by the senior Fergusons to the defendant over the course of several years. The court is unpersuaded. Jacqueline Ferguson testified that on September 12, 1997, she and her husband loaned the defendant sixty thousand ($60,000) dollars in order for him to repurchase a lot in the Farmington subdivision from Gladys Pascus. In support of this claim, Jacqueline Ferguson presented a document purportedly signed by herself, Thomas Ferguson, and the defendant, in which the defendant agreed to repay his parents the sum of sixty thousand ($60,000) dollars on demand. As evidence of the transaction, Jacqueline Ferguson produced a copy of a check dated September 12, 1997 in the amount of thirty thousand ($30,000) dollars payable to Gladys Pascus, and written by the defendant on CT Page 12132 the LTF Developers, LLC., account. Other than this self serving note of dubious authenticity, there is no evidence that Thomas and Jacqueline Ferguson loaned any funds to the defendant on September 12, 1997. And, evidence of the check in the amount of thirty thousand ($30,000) dollars to Gladus Pascus is inconsistent with Jacqueline Ferguson's claim that the sum of sixty thousand ($60,000) dollars was paid to Ms. Pascus. The court finds unworthy of credit Mrs. Ferguson's claim that she paid a supplemental sum of thirty thousand ($30,000) dollars to Ms. Pascus in cash at the payee's insistence. Indeed, for whatever reason Ms. Pascus was paid thirty thousand ($30,000) dollars on September 12, 1997, it is evident that the payment was made by LTF Developers, LLC, an entity which the evidence discloses was created subsequent to the bringing of this action and is owned nominally by Jacqueline Ferguson and her son, the defendant.
Jacqueline Ferguson also testified that starting on August 21, 1996, Ferguson Electric Co., Inc. advanced funds to the defendant for purposes of developing a project known as the Pequabuck Lane Subdivision. Mrs. Ferguson claimed that the balance of this loan, as of April 14, 1998, was two hundred sixty-five thousand, five hundred and thirty-seven ($265,537) dollars. If there were merit to this claim, the defendant would owe this sum to Ferguson Electric and not to his parents. Indeed, the note which purports to evidence this debt runs in favor of the corporation and the corporation's financial statement for the period ending November 30, 1997 reflects a sum due from shareholder not dissimilar to the amount of this claim.
As further evidence of funds allegedly due the senior Fergusons by the defendant, Jacqueline Ferguson presented a document, purportedly executed on January 5, 1995, which states, in sum, that the defendant will repay the Ferguson Realty partnership or Thomas Ferguson personally for sums advanced to him from the realty partnership to pay taxes on the Farmington subdivision and his personal residence. Mrs. Ferguson submitted a computer tally indicating that with principal and interest, the defendant owed the sum of one hundred and three thousand, five hundred and ninety-seven thousand ($103,597) dollars as of January, 1998 on account of this transaction. She testified that all the funds advanced to the defendant in this regard came from the realty partnership. Assuming the legitimacy of the documents proffered at trial, this debt is owed to the realty partnership and not to the senior Fergusons. CT Page 12133
Jacqueline Ferguson further claimed that on September 7, 1990, she and her husband loaned the sum of sixty-seven thousand ($67,000) dollars to the defendant to enable him to refund a deposit on a lot in the Pequabuck Lane subdivision. Mrs. Ferguson claimed that the present balance of this obligation, including principal and interest, was one hundred forty thousand, nine hundred and forty-three ($140,943) dollars as of April 7, 1998. In support of this assertion, Mrs. Ferguson presented a document purportedly signed by herself, her husband, and the defendant on September 7, 1990, and a computer-generated account balance. The evidence is unpersuasive. The court was presented with both an original and a copy of this alleged note. A cursory comparison of these documents makes it evident that the copy and the original are dissimilar. The fabrication of one, or both, these documents erodes the court's ability to rely on either of them as substantiation of this claimed loan. While the proffer supports the claim that the elder Ferguson's mortgaged their property in August, 1990, there is no credible evidence that the sums raised through this financing were advanced to the defendant.
Jacqueline Ferguson's next claim regarding funds allegedly advanced to the defendant suffers a similar lack in trustworthiness. She testified that on December 10, 1992, she and her husband loaned one hundred and two thousand, one hundred and thirty-six ($102,136) dollars to the defendant so that he could resolve a law suit and satisfy a lien regarding the Pequabuck Lane project. Once again the proffer in support of this claim included an original and a copy, and the signatures on the documents do not match. Additionally, while the documents submitted in support of this claim demonstrate that on or about December 10, 1992 the defendant paid the sum of one hundred thousand ($100,000) dollars in satisfaction of a judgment in connection with the Pequabuck Lane project, there is no credible evidence that the necessary funds were advanced to him by his parents.[9]
Finally, Jacqueline Ferguson testified that the defendant owes her and her husband the sum of two hundred eighty-six thousand, three hundred and eighty ($286,380) dollars resulting from a transaction which, she stated, occurred on May 27, 1989. Mrs. Ferguson testified that the defendant purchased a four lot subdivision in Plainville, Connecticut from Frederick Hoerle for the sum of two hundred and eighty-seven thousand ($287,000) dollars, that the defendant paid eighty-seven thousand ($87,000) dollars at the closing, and the balance was financed by the CT Page 12134 seller. Mrs. Ferguson stated that when Mr. Hoerle demanded the funds due to him, the elder Fergusons borrowed the sum of two hundred thousand ($200,000) dollars from the Bristol bank in order to pay Mr. Hoerle, and the defendant agreed to repay them this amount plus interest. Once again, the documentation concerning this purported transaction is incomplete and untrustworthy. The defendant submitted both an original and a copy of the document which he claims is primary evidence of the loan from his parents. For reasons which were not satisfactorily explained to the court, the signature of the defendant on the original of this document is clearly not the same signature as shown on the document which the defendant submitted as a copy. Additionally, the supporting documents do not adequately demonstrate that funds were actually advanced from the elder Fergusons to the defendant in conjunction with this transaction. Indeed, it appears that the elder Fergusons actually took over ownership of this project and marketed the lots themselves, retaining the profits from each lot as it was sold, thus becoming the primary stockholders in this project. The evidence proffered by the defendant is insufficient to warrant a finding that he does, in fact, owe the defendants the sum claimed.
As further erosion of the defendant's claim that he owes substantial funds to his parents is the absence of proof that the defendant has made any payments on any of the alleged loans notwithstanding his receipt of substantial sums over the past several months from Ferguson Electric and from the sale of lots. Also, financial statements prepared on behalf of the defendant and his parents do not support their present contention of the amount due to the senior Fergusons. The plaintiff produced statements of financial condition prepared for Thomas and Jacqueline Ferguson by their accountant for the time periods November 30, 1995 and December 31, 1996. In each statement, there is a balance sheet. The balance sheet for November 30, 1995 lists as an asset, "note receivable-Lee Ferguson 92,500". Plaintiff's Exhibit 14, Statement of Financial Condition, November 31, 1995. On the statement for the following year, the same note in the same amount is listed as an asset cf. Plaintiff's Exhibit 13, Statement of Financial Condition, December 31, 1996. While this claimed amount corresponds to none of the documentation proffered by Jacqueline Ferguson, it is some evidence that by the end of 1996, the defendant owed his parents ninety-two thousand ($92,000) dollars.
During the course of this action, the defendant has filed CT Page 12135 numerous financial affidavits. On affidavits dated January 17, 1996 and February 14, 1996, the defendant showed no liability to his parents. On an affidavit dated June 25, 1997, he claimed a liability of one hundred seventy-six thousand, nine hundred and twenty-three thousand ($176,923) dollars owed to his parents. A year later, by affidavit dated June 8, 1998, he asserted that he owed his parents the sum of three hundred and fifty-four thousand, eight hundred and eighty-three ($354,883) dollars, and little more than a month later, on July 20, 1998, he swore that the balance of his liability to his parents was six hundred and seventy-seven thousand, three hundred and twenty ($677,320) dollars. None of the testimony adduced at trial supports these changes. All of these affidavits, reviewed in concert, reflect the defendant's indifference to the obligations of an oath.
The parties have agreed, and the court finds, that the fair market value of the family residence at Hollyberry Lane is two hundred and twenty-five thousand ($225,000) dollars. The parties purchased this home for one hundred and three thousand ($103,000) dollars, utilizing as a down payment the sum of fifty-three thousand ($53,000) dollars realized from the sale of their first marital residence and from their savings. While the principal balance of the first mortgage on this property is approximately forty-three thousand ($43,000) dollars, additional financing encumbers this property. On February 10, 1995, the parties mortgaged this property to the Bristol Savings Bank in conjunction with Ferguson Electric obtaining a one million, five hundred thousand ($1,500,000) dollar line of credit. Previously, the parties had mortgaged the property in conjunction with Ferguson Electric obtaining a line of credit of one million ($1,000,000) dollars from the First National Bank of Connecticut. When the Bristol Savings Bank credit line was extended, the Fergusons agreed to subordinate the First National Bank mortgage to this new line of credit. At trial, the defendant testified that while the corporation has borrowed on this line of credit, he did not know whether there was a present debit balance. The court notes that the financial statement for Ferguson Electric, dated November 31, 1997, reflected that the outstanding balance on the company's line of credit at that juncture was zero.
During the pendency of this action, the defendant has been obligated to pay the real estate taxes on this property. At trial, the defendant acknowledged that taxes due in July, 1998 are presently in arrears. CT Page 12136
Through his employment, the defendant has a 401k retirement plan with a principal balance of one hundred twenty-four thousand, five hundred ($124,500) dollars. This asset was earned entirely during the course of the marriage. The defendant also has two life insurance policies, with an aggregate death benefit of fifty-five thousand ($55,000) dollars which he has agreed to maintain for the benefit of the children.
While Mrs. Ferguson was a dutiful and faithful spouse, Mr. Ferguson failed his responsibilities as a husband and parent in the marriage. Though the early years of the marriage were unremarkable, by 1980 the defendant had begun to abuse both alcohol and drugs, and he was emotionally abusive to Mrs. Ferguson, and physically and emotionally abusive to the children. For most of the marital years, rather than dining with his family during the week, Mr. Ferguson lingered after work at a drinking establishment where he frequently became so besotted on alcohol and unprescribed prescriptive medications that he arrived home oblivious to his physical environment and incapable of reasonable personal navigation requiring that he be put to bed by his wife. He constantly, and without cause, ridiculed Mrs. Ferguson for her physical appearance and mannerisms, and refused to be with her publicly because he found her to be socially unacceptable. Untutored in the skills of appropriate parental intervention and impatient with his children, Mr. Ferguson frequently struck them, thus modeling excessive physical violence as a means of interpersonal communications. These malevolent and misguided behaviors persisted throughout the marriage, ultimately, for Mrs. Ferguson, rendering maintenance of a spousal relationship incompatible with her physical and emotional well-being.
The failure of this marriage has tattered the family. All four children have required psychological intervention. Because the defendant defaulted in his parental role throughout the marriage, Mrs. Ferguson has been required to expend more time and emotional energy in close supervision of the children, thus making her less available for outside employment and wholly unprepared, on the eve of marital dissolution, for financial independence.[10] While the purpose of alimony is neither to punish the wrongdoer nor to reward the victim, the consequences of Mr. Ferguson's wrongful behaviors has adversely impacted Mrs. Ferguson's readiness for outside employment. Thus, in this case, the cause for the dissolution, as one statutory factor, is interwoven with the absence of significant vocational skills and employability in the plaintiff. cf. Connecticut General Statute CT Page 1213746b-81. Mr. Ferguson has a continuing duty to support Mrs. Ferguson.
The plaintiff seeks counsel fees. Counsel have stipulated, and the court finds, that counsel's rate of two hundred and fifty ($250) dollars an hour is reasonable. In support of her claim for fees, the plaintiff submitted an affidavit from counsel detailing the time and effort expended by counsel on the plaintiffs behalf. Having reviewed counsel's affidavit in light of the evidence adduced at trial, the court finds that counsel's fees are fair and reasonably incurred. Additionally, the court notes that the defendant unnecessarily caused the plaintiff to incur counsel fees to defend a spurious and unfounded quest by the defendant to have the issue of custody submitted for professional evaluation. In the face of the defendant's abdication of his parental responsibility during the course of the marriage, his claim for custody was not only unwarranted, but constituted an abuse of the plaintiff, the children, and the judicial process.[11]
The court finds that the marriage has broken down irretrievably with no prospect for reconciliation. Accordingly, a decree may enter dissolving the marriage.
Custody of the three minor children is awarded to the plaintiff mother subject to the conditions and provisions set forth in the parties agreement concerning custody and shared parenting dated July 21, 1998. In accordance with the stipulation of the parties and counsel for the minor children, the July 21, 1998 agreement marked as Court exhibit 1, is approved and ordered by the court with the exception of paragraph 3a, which is deleted by agreement. Counsel for the plaintiff shall recite the agreement, except paragraph 3a, in the judgment file.
The defendant is ordered to pay weekly child support to the plaintiff in the amount of five hundred and seventy-five ($575) dollars. In addition, the defendant shall maintain the children as beneficiaries on his existing employment-related health insurance. The parties shall share equally the cost of any health care the plaintiff believes is necessary for any of the minor children. To effectuate this provision, the plaintiff shall provide to the defendant, within two weeks of her receipt, copies of any invoices she receives from any care givers and the defendant shall reimburse the plaintiff his one half share within two weeks thereafter. With regard to health insurance, the provisions of Connecticut General Statute 46b-84 shall apply to this judgment. In determining this child support order, the court CT Page 12138 has carefully considered and rejected the arguments advanced by the defendant that a lesser amount should be awarded because he has assumed the responsibility for the care of the parties' adult child, Ryan.
So long as the defendant is current on his total child support obligation as of December 31st of the tax year and so long as it inures to his tax benefit, he shall be entitled to claim Geoffrey and Andrew as dependency exemptions in filing his income tax returns. The plaintiff shall be entitled to claim Thomas in each year and both Geoffrey and Andrew in any year in which the defendant is not in full compliance with the court's orders regarding payment of child support by December 31st of the reporting year, or in any year in which the defendant receives no tax benefit for the claim. For this purpose, the parties shall exchange draft tax returns by April 1st of each year. Failure of either party to provide such draft return shall entitle the other party to make the dependency exemption claim for all children then eligible to be claimed as dependents.
As periodic alimony, the defendant shall pay to the plaintiff the sum of nine hundred ($900) dollars a week to terminate on the death of either party or the remarriage of the plaintiff and modifiable as provided by law. The court contemplates that the payment of alimony shall be deductible by the defendant and includable as income by the plaintiff for income tax purposes.
The defendant shall maintain the plaintiff as an insured on his existing employment-related health insurance, at his cost, for so long as the plaintiff is legally eligible for such coverage.
By way of a Qualified Domestic Relations Order, the defendant shall transfer to an IRA account in the plaintiff's name, the sum of seventy-five thousand ($75,000) dollars from his 401K account. To effectuate this provision, within twenty days of this order, the plaintiff shall notify the defendant, through counsel, of the account number and banking institution of her IRA account, and within twenty days thereafter, the defendant shall cause the necessary transfer.
As a further division of assets, the defendant is ordered to pay to the plaintiff the additional sum of four hundred thousand ($400,000) dollars as follows: CT Page 12139
Fifty thousand ($50,000) dollars by December 31, 1998, and twenty-five thousand ($25,000) dollars on each succeeding July 1st and December 31st until the full amount is paid. In addition, the defendant shall pay simple interest at the rate of 6% per annum on the unpaid principal of this obligation, with the interest payment due and owing on December 31st of each year during the lifetime of the obligation. Interest shall run from the date of this memorandum. In order to secure payment of this amount, the defendant shall execute and deliver to the plaintiff, through counsel, a promissory note in the principal amount of four hundred thousand ($400,000) dollars with six percent (6%) simple interest in favor of the plaintiff within thirty days of this memorandum. This note shall be secured by a mortgage on the Farmington subdivision. Funds realized by the defendant from the sale of lots in the subdivision may be utilized to pay the mortgagee bank in accordance with previously agreed terms, routine closing costs, development costs not to exceed thirty-five thousand ($35,000) dollars a lot, and contractor's costs relating directly to construction on the lot, and the balance shall be placed into an interest-bearing escrow account to be held in the name of both counsels or counsel as each party may designate. Proceeds from the escrow account shall be disbursed to fulfill the defendant's obligation under this part as it arises, but shall otherwise remain in an interest bearing escrow account until the entire amount is paid. In no event shall payments be made to any entity in which the defendant has any direct or indirect interest, except that reasonable payments may be made to Ferguson Electric for electrical work performed.
As further security for the payment of the sum of four hundred thousand ($400,000) dollars, the defendant shall pledge his stock in Ferguson Electric as collateral and he shall not, by any action or corporation on his part, permit the diminution in value of his stock below its agreed present market value. Counsel for the plaintiff shall, within thirty days of this memorandum, prepare and submit to defendant's counsel the appropriate documentation to effectuate this provision.
Within thirty days of this memorandum, the defendant shall convey to the plaintiff all his right, title, and interest in and to the parties real estate located at 135 Hollyberry Lane, Plainville, subject only to its first mortgage. At the time of the conveyance, the defendant shall ensure that the mortgage payments are current and that all past due taxes, penalties and CT Page 12140 interest are paid to the date of conveyance. As president of Ferguson Electric, the defendant shall make reasonable effort forthwith to renegotiate the corporation's line of credit so as to remove the Hollyberry Road property as security. In any event, as president of the corporation, until such time as the Hollyberry Road property is free of this incumbrance, the defendant shall not cause or permit Ferguson Electric to borrow on it's line of credit so as to encumber the property, and the defendant shall hold the plaintiff harmless from any claims made by any banking institution against the property on account of any lines of credit for which the property may already have been offered as security. Additionally, to the extent that there exists a personal line of credit for which this property is security, the defendant shall pay and hold the plaintiff harmless from the obligation of this line of credit, and he shall not incur any further borrowing on such line. The plaintiff shall be responsible for payment of the first mortgage on the property and shall hold the defendant harmless therefrom.
The defendant is ordered to pay the plaintiff, through counsel, the sum of twenty five thousand ($25,000) dollars as counsel fees within sixty days of this decision. In addition, the defendant shall be solely responsible for and shall pay the balance of any fees due counsel for the minor children and any remaining balance owed to Kenneth Robson, M.D., who conducted a custody evaluation in this matter.
The plaintiff is presently driving a motor vehicle owned by Ferguson Electric. Within sixty days of this decision, the defendant shall purchase for the plaintiff and cause to be registered in her name a motor vehicle of comparable value as measured by the NADA Blue Book for retail sales. The defendant may satisfy this requirement by causing Ferguson Electric to transfer an unencumbered title of the motor vehicle the plaintiff is driving to her within the stated time period. At the time of the transfer, the motor vehicle must be road worthy and capable of being registered with no property taxes due.
In formulating these orders, the court has carefully considered the statutory criteria set forth in 46b-80, 46b-81, 46b-82,46b-215, 46b-62 and relevant decisional law.
Other than for disposition of assets and liabilities as hereinbefore stated, each party shall be entitled to ownership of the assets each presently possesses and each shall be solely CT Page 12141 responsible for payment of the liabilities each has previously incurred. In this regard, the plaintiff shall be solely responsible for payment of the First USA Visa as shown on her affidavit even though the credit card may be in the defendant's name, and she shall hold the defendant harmless therefrom.
Counsel for the plaintiff shall prepare the judgment file.
Judgment may enter accordingly.
Bishop, J.